

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB 2 6 2008

# FILED

FEB 2 6 2008 *MB*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff-Respondent,     )
                                    )
     -vs-                           )     Case No.: 1:07-cv-06409
                                    )      (Crim. No. 96-cr-815-1)
EDWARD LEE JACKSON, JR.,            )     Judge Charles P. Kocoras
                                    )
          Defendant-Petitioner.     )


## DECLARATION OF EDWARD LEE JACKSON, JR., IN SUPPORT OF MOTION TO VACATE CONVICTIONS AND SENTENCE UNDER 28 U.S.C. § 2255


I, Edward Lee Jackson, Jr., make the following statements under the penalty of perjury.

1.  I am the person named Defendant-Petitioner in the case captioned above.  I make this Declaration is support of my motion to vacate conviction and sentence imposed in case 96-cr-815.

2.  My § 2255 motion claims entitlement to collateral relief on four (4) grounds:  Ground One, conviction obtained in violation of U.S. Constitution, Amendment V (denial of due process of law – Government withheld evidence material and favorable to my defense); Ground Two, conviction obtained in violation of U.S. Constitution, Amendment VI (confrontation clause violation); Ground Three, conviction obtained in violation of U.S. Constitution, Amendment VI (denial of right to conflict-

free counsel and ineffective assistance of counsel at trial);
Ground Four, conviction obtained in violation of U.S. Constitution,
Amendment VI (ineffective assistance of counsel on direct appeal).

3.  On December 12, 2006, I made a request for access to
investigative records of my case pursuant to the Freedom of
Information Act ("FOIA").  On September 10, 2007, in response
to my FOIA request, a number of pages of records were released to
me which indicate that the Federal Bureau of Investigation ("FBI")
initiated its investigation leading to my arrest and conviction
in March 1993, and that going forward, FBI investigators planned
to use confidential informants to obtain incriminating evidence
against me via consensually monitored conversations.  See the
attached Exhibit 1 (FBI report released in response to FOIA
request).

4.  The testimony of Government witnesses at my trial indicates
that the investigation leading to my arrest and conviction did
not begin until a much later date than established by Exhibit 1.
The relevant testimony is contained in trial transcripts which I
have attempted to obtain, from former counsel and this Court,
without success.  I cannot, therefore, provide a more specific
statement as to witness' testimony regarding the investigation's
start.

5.  No records of the FBI's investigation of me, prior to
November 1995, were disclosed to me or my attorney as part of
the Government's pretrial discovery.  The possible materiality

6.   It is inconceivable that no additional records were created in the years 1993, 1994 and 1995, in connection with an FBI investigation authorized and initiated on or about March 19, 1993.  See the attached Exhibit 2 (Assistant U.S. Attorney's "Memo").  In fact the FBI's response(s) to my FOIA request indicate there exist more than 3,000 pages of investigative records that were not released because I was unable to pay copying costs; my request for waiver of these costs was denied. See the attached exhibit 3 (FOIA response letter dated 8/1/07).

7.   The possible materiality of these undisclosed records to defenses of entrapment and fabrication of evidence, as well as potential usefulness for purposes of impeachment of Government witness, is obvious.

8.   I have asserted to my attorneys and maintained from the outset of judicial proceedings against me in this case that I have been the victim of evidence fabrication, false statements, perjured testimony and other illegal/improper conduct, which was directed or undertaken by overzealous, self-serving investigators and prosecutors who could not make a case against me justifying their massive expenditure of public resources by any other means.  Some evidence supporting such a defense theory was developed in pretrial and related proceedings in this Court. For example: Confidential Informant ("C/I") Myron Robinson was indicted for and pleaded guilty to making false statements to a federal grand jury regarding my involvement in a December

8, 1995 robbery, the predicate for a charge in my indictment which the Government moved to dismiss (Count Two, earliest alleged criminal conduct); shortly before the December 8,1995 robbery, which was exposed as an attempt to frame me, Chicago Police Department ("CPD") Internal Affairs Division ("IAD") officer, Eugene Shephard and FBI Special Agent, R. Lee Walters, leaders of the joint surveillance team that misidentified me as a participant and thus  corroborated the C/I's lies, were recorded giving instructions to Myron Robinson how to induce/ lure me into making incriminating statements.[1]

9.  I believe that, if given the opportunity to develop the relevant facts utilizing available discovery procedures, I can show that the Government withheld from me evidence that was material and favorable to my defense, in violation of <u>Brady v. Maryland</u>, and that I am entitled to § 2255 releif or, at least, an evidentiary hearing.

10.  My statements in paragraphs 3 thru 9, ante, are offered in support of Ground One of my § 2255 motion.

11.  I was indicted in case 96-cr-815 on December 30, 1996. I was arrested and presented in the U.S. District Court, Northern District of Illinois, the following day.

12.  I retained defense attorney Joan Hill-McClain to represent me; she entered her appearance in the case on December

[1] See also the attached Exhibits 4 (Charles Vaughn Affidavit) and 5 (June 1996 Title III Affidavit).

23, 1996.

13.   In January 1997, attorney Hill-McClain entered her appearance as counsel for Terry Young in case 97-cr-63 in this Court.

14.   On May 19, 1997, I was indicted as a co-conspirator with Terry Young and others in case 97-cr-63.

15.   Perceiving a  potential conflict of interest in Ms. Hill-McClain's representation of both Terry Young and myself, the Government filed a motion to disqualify Hill-McClain as counsel in 97-cr-63 and requested a hearing on the issue.

16.   On June 13, 1997, during a hearing before Judge George W. Lindberg, Mr. Yound and I waived our right to conflict-free counsel and Ms. Hill-McClain was permitted to continue to represent me but not Mr. Yound.

17.   During a hearing before judge Lindberg on December 29, 1997, the Government revealed that conversations between Ms. Hill-McClain and Terry Young had been recorded on an authorized wiretap, implicating, again, a potential conflict of interest in Ms. Hill-McClain's representation of me.  However, Ms. Hill-McClain failed to appear in court that day and the matter was continued.

18.   The conflict of interest issue was next addressed in a hearing before Judge Lindberg on January 12, 1998.  In addition to the interception of Ms. Hill-McClain a dozen times during course of wiretap on Terry Young's telephone, it was brought

out that documents appearing to link Hill-McClain and Mr. Young
in business affairs were seized during execution of a search
warrant at Mr. Young's home, and that other individuals who
Ms. Hill-McClain had previously represented would be called as
witnesses for the Government and that Ms. Hill McClain herself
might be called as a witness in 97-cr-63.  Government counsel
represented that there was a need for Mr. Young and I to reconsider
our previous conflict waivers in light of the new information.
the matter was continued to the following day.

19.  Also, in the afternoon of January 12, 1998, I appeared
before Judge Ann C. Williams in case 96-cr815.  Ms. Hill-McClain
addressed Judge Williams regarding some of the conflict of
interest issues that had arisen in the case before Judge Lindberg.

20.  Judge Williams inquired then if Ms. Hill-McClain's
representation of me presented conflict issues in case 96-cr-815.
In reply, Assistant U.S. Attorney ("AUSA") Brian Netols stated
that Anthony Buchanan, a witness in 97-cr-63 who had a previous
attorney-client relationship with Hill-McClain, would also be
testifying for the Government in 96-cr-815.

21.  Judge Williams, UASA Netols and Hill McClain all
acknowledged that a potential conflict of interest existed if
Mr. Buchanan was going to testify for the Government against me
in 96-cr-815.  Judge Williams then requested the AUSA to interview
Anthony Buchanan to determine the extent of the potential
conflict of interest in 96-cr-815 for Ms. Hill-McClain and I.

22.  When proceedings resumed before Judge Lindberg, on
January 13, 1998, there was further discussion about the conflict
issues presented should Ms. Hill-McClain's former clients
testify against me for the Government.  Ms. Hill-McClain opined
that, in the circumstances, the Court should either remove her
as my attorney or sever me out of the trial of Terry Young and
the other 97-cr-63 defendants.  An AUSA, Mark Hersh, responded
that the problems posed by Anthony Buchanon's probable testimony
would remain even if I was tried at some later time.  Judge
Lindberg indicated his agreement with the AUSA's assessment
and added **that the same conflict issues would be present in the
case before Judge Williams.**

23.  Judge Lindberg subsequently questioned Terry Young and
I concerning our willingness to re-execute our previous waivers
of any conflicts in light of the newly disclosed information
about overhears of Hill-McClain/Terry Young conversations.  In
the context ofthis re-execution of of my conflict of interest
waiver, AUSA hersh stated that my decision whether or not
to waive any possible conflict in the case before Judge Lindberg
could govern whether attorney Hill-McClain would be allowed
to represent me in  the case before Judge Williams.  Although
Hill-McClain disputed this assertion of the AUSA, stating
that whether she represented me in case 96-cr-815 was a question
for Judge Williams to decide, being confronted with the prospect
of going to trial represented by some other attorney was,

-7-

at the time, disturbing and confusing to me. See <u>U.S. V. Younger</u>, 97-cr-63, January 13, 1998 hearing transcript (hereinafter "Tr. (1/13/98, 97-cr-63") at 48:9-13 ("...my client has just asked me a good question, he said, 'What's going on now" What does all this mean?' and I'm not sure how to advise him at this point..."). Copy attached as Exhibit 6.

24. Ms. Hill-McClain did not fully explain to me the nature and implications of the recorded conversations between her and Terry Young. I did not understand that the conversations recorded might constitute evidence of Hill-McClain's involvement in obstructing justice in a double murder prosecution. I did not know, until long after I was convicted, that the U.S. Attorney's office which was prosecuting me was also investigating Hill-McClain for possible violations of the criminal laws; or understand how, in the circumstances, attorney Hill-McClain's representation of me could involve conflicting interests. Ms. Hill-McClain told me only that the recorded conversations concerned other matters/cases, and that if I waived any conflict issues in Judge Lindberg's court I would be severed out of the trial with Terry Young but she (Hill-McClain) would continue to represent me in the case before Judge Williams.

25. Lacking complete information and confused about what was really in my best interest, I agreed to waive any potential conflicts in the case before Judge Lindberg, in light of the overhears of Hill-McClain and Terry Young.

26.   Terry Young did not waive the possible conflict of
interest issues presented by Hill-McClain's representation
of me at our trial, in light of the recorded conversations
between those two.  For that reason, I was, in fact, severed
from the trial of Terry Young in case 97-cr-63.

27.   After I was found guilty in this case I learned
that, during the time Hill-McClain was representing me, she
was the subject of a "special interception" authorization
related to an investigation into her possible obstruction of
justice in a state court double murder prosecution, and that
the overhears I waived potential conflicts in regard to were
products of this obstruction investigation.

28.   Had I understood the nature and implications of
the recorded Hill-McClain/Terry Young conversations, I would not
have waived any possible conflict of interest issues before
Judge Lindberg.

29.   Prosecutors in case 96-cr-815 knew or should have
known that Ms. Hill-McClain was under investigation for possible
obstruction of justice prior to my trial.

30.   The existence of potential conflict of interest
issues, arising in connection with Hill-McClain's representation
of me, was acknowledged on the record by Judges Williams and
Lindberg, AUSAs Hersh and Netols, and Ms. Hill-McClain herself, but
**Judge Williams did not conduct an inquiry into the possiblity
of a conflict interest presented by the obstruction investigation,**

or by having a former client, Anthony Buchanan, testify against
me for the Government.

31.    Attorney Hill-McClain labored under actual conflicts
of interest while representing me in case 96-cr-815, and her
performance was adversely affected as a result.  Ms. Hill-
McClain's representation of me was in conflict with the attorney-
client relationship between her and Anthony Buchanan, who
testified against me for the Government during the trial.
Ms. Hill-McClain's representation of me was also in conflict
with her own self-interest in avoiding prosecuiton/appeasing
prosecutors in connection with federal law enforcement's inves-
tigation of her.

32.    Among other things, Ms. Hill-McClain's conflicts
of interest caused her to fail to make a timely motion for
a jdugment of acquittal on the ground that the Government
did not offer any proof of an effect on interstate commerce
to support my Hobbs Act convictions.

33.    Attorney Hill-McClain also failed to interview, call
and introduce testimonial evidence of the following persons:
Charles Vaughn, an available witness who would have testified
to facts consistent with his affidavit attached hereto as
Exhibit 4; Michael Hunt, an available witness who would have
testified to facts consistent with his affidavit attached
hereto as Exhibit 7; Larae Bailey, an available witness who
would have testified to facts consistent with his affidavit

attached hereto as Exhibit 8.

34.   Attorney Hill-McClain also failed to discover/subpoena
and introduce evidence favorable to my defense including:
records of the Government's investigation of me between March
19, 1993 and November 1995, which contain evidence supporting
a defense of government entrapment and fabrication of incriminating
evidence (see paragraphs 3 thru 9); CPD reports which provide
evidence that the Mafi and McDonald's incidents did not occur
as alleged by Government witnesses at my trial; tape recorded
conversations and other evidence which show that two key law
enforcement officer witnesses at my trial, Eugene Shephard and
R. Lee Walters, approved and/or orchestrated C/I Myron Robinson's,
and undercover agent Deborah Jones-Buggs' fabrication and
misrepresentation of evidence to incriminate me.

35.   Attorney Hill-McClain's performance as trial counsel
was deficient in other respects, as set forth in my Affidavit
of March 22, 1999, attahced as Exhibit 9, and incorporated.

36.   Paragraphs 11 thru 35, above, are statements in
support of Ground Three in my § 2255 motion.

37.   After my trial, attorney Kent R. Carlson was appointed
to represent me and was counsel of record in my direct appeals.

38.   I asked Mr. Carlson to raise issues in my direct
appeals which he did not.  These issues included: whether
I was denied my constitutional right to present a defense
by the trial court's exclusion of evidence of Government witnesses

-11-

false testimony and other misconduct related to a December
8, 1995 robbery I was framed in and charged with; whether
the trial court violated my Confrontation Clause rights by
preventing defense cross-examination of informants and police
officers whose statements inculpating me were admitted at
trial; Whether my right to a fair trial was violated by prosecu-
tors' closing remarks to the jury; whether I was denied an
impartial jury.

39. The jury-impartiality issue includes, but is not
limited to, the fact that the jury foreman expressed racial
prejudices but was not disqualified.

40. The closing arguments issue includes, but is not
limited to: AUSA Netol's misleading statement to the effect
that if I had tape recordings to bolster my testimony I would
have played them for the jury, when he had previously argued
to this Court that the tape recordings being referred to should
not be admitted into evidence; AUSA Ryan Stoll's vouching for
the credibility of the Government's witnesses, and calling me
a liar.

41. The Confrontation Clause issue is based on facts,
including but not limited to, the Court's refusal to permit
the cross-examination of Myron Robinson, Eugene Shephard and
others regarding the December 8, 1995 robbery in which I was
falsely identified and accused.

42. The right to present a defense issue is based on

facts including, but not limited to, those set forth  in the
preceding paragraph 8 above.

43.   The complete files of my case were turned over to
Mr. Carlson by my former attorneys or delivered directly to him
by this Court.

44.   My ability to present additional facts in support
of the grounds for relief in my § 2255 motion has been prohibited
by Mr. Carlson's refusals to comply with my several past requests
to turn the case files over to me.  For example, the motion,
responses and hearing transcripts related to the Courts April
14, 1998 order, excluding defense introduction of, or allusion to,
any evidence of the December 8, 1995 robbery incident, almost
certainly contain matters of fact relevant to issues raised by
my motion and this Declaration.

45.   On February 19, 2008, Mr. Carlson contacted authorities
at the prison where I am confined to communicate his intention,
and obtain authorization, to mail my case files to me.  I
anticipate their delivery before March 10, 2008.

46.   It is my understanding that Mr. Carlson was finally
persuaded of his professional duty to comply with my requests
for the files after the Attorney Registration and Disciplinary
Commission of the Supreme Court of Illinois looked into the
matter.

47.   I deposited my original § 2255 motion with prison

authorities for mailing to the Court Clerk, first-class postage prepaid, on September 28, 2007.  When subsequent correspondence with the Clerk revealed that the motion had not been received, I mailed additional copies of the motion to the Clerk via certified mail.

48.  I intend to file an ammended § 2255 motion and supple-mental declaration following    review of my case files.

49.  On February 21st, 2008, I deposited the instant Declaration with prison authorities for mailing, first-class postage prepaid, and addressed to:

       Office of the Clerk
       United States District Court
       Northern District of Illinois
       219 Dearborn Street
       Chicago, IL 60604

I declare under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.


                         _Edward Lee Jackson_
                         Edward Lee Jackson, Jr.
                         Reg. No. 07546-424
                         Federal Correctional Institution
                         P.O. Box 1000
                         Cumberland, MD 21501-1000


-14-

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2008, I caused a true copy of the foregoing, Declaration in Support of Motion to Vacate Conviction and Sentence Under 28 U.S.C. § 2255, to the attorneys for the Respondent, by delivering same to prison authorities for mailing with first-class postage prepaid and addressed to

    Brian Netols
    Assistant U.S. Attorney
    219 Dearborn Street
    Chicago, IL 60604

Edward Lee Jackson, Jr.

0047  MRI 01673

RR FBICG

DE FBICG #0010 0852141

ZNR UUUUU

R 262136Z MAR 93

FM FBI CHICAGO (194D-CG-90304) (P)

TO DIRECTOR FBI/ROUTINE/

BT

UNCLAS

CITE:  //3150:SQ7B//

PASS:  SSA[          ] WHITE COLLAR CRIMES SECTION, PUBLIC
CORRUPTION UNIT, ROOM 3841.


SUBJECT: [               ] POLICE OFFICER, CITY OF CHICAGO

POLICE DEPARTMENT; CSLPO-LAW ENFORCEMENT-DRUG RELATED; OO:

CHICAGO.

    FOR INFORMATION OF THE BUREAU, THIS MATTER INVOLVES AN

INVESTIGATION OF A LOCAL PUBLIC OFFICIAL, [            ] WHO

IS EMPLOYED AS A POLICE OFFICER WITH THE CITY OF CHICAGO

POLICE DEPARTMENT (CPD).  IT IS ALLEGED THAT [       ] USES HIS

POSITION AS A MEMBER OF THE 15TH DISTRICT TACTICAL TEAM TO ROB

b6
b7C



194A-CG-90304-16

SEARCHED_____ INDEXED_____
SERIALIZED_____ FILED_____
MAR 2 9 1993
FBI  CHICAGO

PAGE TWO DE FBICG 0010 UNCLAS

DRUG DEALERS OF MONEY, PLANT DRUGS AND HANDGUNS ON THEM AND

ARREST THEM ON FALSE CHARGES.   IT IS FURTHER ALLEGED THAT IN

RETURN FOR MONEY AND INFORMATION ON DRUG DEALERS [          ]

WOULD EITHER WRITE THE ARREST REPORT SO THAT IT APPEARS WEAK

OR TAKE CARE OF THE DEFENDANT AT THE PRELIMINARY HEARING.

THESE ALLEGATIONS WERE MADE INDEPENDENTLY [          ]

b6
b7C
b7D

b6
b7C
b7D

^PAGE 3 194D-CG-90304

b6
b7C
b7D

^PAGE 5 194D-CG-90304

SPECIFIC ACTS.

OFFICER

EDWARD JACKSON

JACKSON SIMILARLY

IMPLIED THAT HE AND          ARE INVOLVED IN IMPROPRIETIES AND

WRONGDOING, HOWEVER, HE DID NOT DISCUSS ANY SPECIFIC ACTS.   AT

THIS TIME NO FURTHER CONVERSATIONS BETWEEN

WILL BE CONSENSUALLY MONITORED.

        IT IS ANTICIPATED THAT

                                        A CONSENSUALLY

MONITORED CONVERSATION BETWEEN                      WILL BE

CONDUCTED IN ORDER TO ELICIT CONVERSATION REGARDING

CORRUPT ACTIVITIES.

        THIS INVESTIGATION WAS INITIATED ON 3/19/93 AND IS BEING

CONDUCTED JOINTLY WITH CPD INTERNAL AFFAIRS DIVISION.   FD-759,

FD-761 AND LHM TO FOLLOW.

BT

# Memorandum



Exhibit 2, ___ of 9

| Subject | Date |
|---|---|
| FBI Undercover Operation<br>Notification To State's Attorney's Office | March 19, 1993 |

| To | From |
|---|---|
| SA<br>SA | Scott Levine    b6<br>AUSA        b7C |

On March 19, 1993, I contacted First Assistant States Attorney
Andrea Zopp and notified her about the allegations
b6
b7C
b7D
I further informed her that the FBI was
initiating an undercover investigation concerning these
allegations. First Assistant Zopp thanked me for relating this
information to her, wished us luck in the FBI's investigation, and
asked me to keep her informed of any new developments. First ASA
Zopp also promised me that she would keep this information to
herself and would not repeat it to anyone without seeking our
authorization.

⊗
KSS

If I can be of any assistance this weekend please call me at
work at [        ] or at home at [            ]
Good luck!

b6
b7C





**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

August 1, 2007


Mr. Edward L. Jackson, Jr.
Reg. #07546-424
Federal Correctional Institution
P.O. Box 1000
Cumberland, MD 21501-1000

            Re: FOIPA Request Concerning You
                Request No. 1068905

Dear Mr. Jackson:

        Reference is made to your Freedom of Information-
Privacy Act (FOIPA) request for FBI Chicago Field Office records
concerning you, specifically a Corruption of Public Officials
investigation surrounding your trial.

        Our initial review has determined that approximately
3470 pages appear to be responsive to your request.  Pursuant to
Title 28, Code of Federal Regulations, Sections 16.11 and 16.49,
the duplication fee schedule is ten cents for every released
page, except for the first 100 pages, which are released without
charge.

        Your FOIPA request letter of December 12, 2006, advised
us that you were unable to pay any duplication costs and
requested a waiver of duplication fees.  This request for a
waiver is being hereby denied. Inasmuch as the release of the
information concerning you is more in your personal interest as
opposed to contributing to the understanding of the public at
large, a waiver of the fees would not be appropriate.  Similarly,
indigence is not a justification for waiving fees.

        Therefore, since you have advised us that you are
unable to pay the duplication costs, only the first 100
releaseable pages, which are without fee, will be processed for
disclosure to you.  Your request will now be placed in our
backlog of unassigned FOIPA requests.  We anticipate it will be
assigned for processing in the near future.

        You may appeal the denial of your fee waiver request.
Appeals should be directed in writing to the Office of
Information and Privacy, U.S. Department of Justice, 1425 New

York Avenue, NW,   Suite 11050, Washington, D.C. 20530-0001,
within 30 days from receipt of this letter.  The letter and
envelope should be clearly marked "Freedom of Information/Privacy
Appeal."  Please cite the FOIPA request number assigned to your
request so that it can be easily identified.

                              Sincerely yours,

                              *David M. Hardy*

                              David M. Hardy
                              Section Chief
                              Records/Information
                                Dissemination Section
                              Records Management Division

2

Exhibit 4, ___ of 9

RECEIVED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS    JUL 10 2000
EASTERN DIVISION

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA,            )
                    Plaintiff,       )
                                     )
        v.                           )    CASE NO. 96-CR-815
                                     )
                                     )    Judge Ann Claire Williams
EDWARD LEE JACKSON JR.,              )
                    Defendant.       )


STATE OF ILLINOIS  )
                   )   SS        A F F I D A V I T
COOK COUNTY        )


        I, Charles Vaughn, do solomnly swear under the penalty of
perjury to the true facts contained herein this affidavit.

1.      At no time was Edward Lee Jackson Jr, aka Pacman, ever
involved in the planning, execution of or directing of myself
or any individuals involved in a December 8, 1995 robbery.

2.      I informed authorities that Myron Robinson had planned
and directed this robbery and had lied by falsely implicating
Edward Lee Jackson Jr. and Chicago Police Officer Lennon
Shields in the robbery.

3.      There were no Chicago Police or any other law enforcement
officers involved in the robbery.

4.      Authorities that interviewed me regarding the December 8,
1995 robbery attempted to coerce me into falsely implicating
Edward Lee Jackson Jr, in this robbery.

5.      I informed attorney Joan Hill McClain that I would testify
to all of the contents contained in this affidavit during any
trial or hearing, in advance of trial in this matter.

6.      I have not been threatened, coerced or offered anything
to give this statement, it is entirely free and voluntary and
it is the truth.


Subscribed and sworn to          _____
this  13  day of                 Charles Vaughn, Affiant
July, 2000.                      MCC-Chicago-Unit 21
                                 71 W. Van Buren St.
                                 Chicago, Illinois. 60605

Exhibit 5, ___ of 9



EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE THE APPLICATION OF          )
THE UNITED STATES OF AMERICA      )
FOR AN ORDER AUTHORIZING          )
THE INTERCEPTION OF               )       94 GJ 932      June 9 6
WIRE COMMUNICATIONS TO AND FROM   )
TELEPHONES ASSIGNED NUMBERS (312) )
826-0334, 722-8270, AND 722-8384, )
AND OF ELECTRONIC COMMUNICATIONS  )
TO DIGITAL PAGING DEVICES ASSIGNED )
NUMBERS (312) 707-7316, 657-6703, )
712-4156, 837-3393 AND 979-5272   )       UNDER SEAL

## AFFIDAVIT IN SUPPORT OF APPLICATION

### INTRODUCTION

I, JOSEPH MARK KARMIK, Special Agent of the FEDERAL BUREAU OF INVESTIGATION (FBI), United States Department of Justice, having been duly sworn, state:

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, USC, that is, an officer of the United States who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in Section 2516 of Title 18, USC. I am a Special Agent of the FBI and have been so employed for approximately nine and one half years.  I have been assigned to the Chicago Division for approximately five months.  During the past nine years while assigned to the Houston Division, I have conducted investigations involving police corruption, organized crime and narcotics.  I have received specialized training in corruption matters and narcotics and dangerous drug investigations while employed as a Special Agent.  The experience has afforded me the opportunity to observe

1

and once for manufacture or delivery of a controlled substance in 1989. McBeth's NCIC record indicates that he is a known Traveling Vice Lords gang member with the street name "Killer." During a Task Force surveillance on January 11, 1996, McBeth was observed in the company of 15th District CPO Edward Lee Jackson, Jr.

m. Ronnicia Blue resides at 4840 W. Adams, Chicago, to which telephone number (312) 287-3870 is assigned. As set forth in greater detail below, a woman believed by the affiant to be Blue has identified herself as "Pac's girlfriend," and was involved in the undercover rip-off which occurred on May 2, 1996.

## UNDERCOVER OPERATION

13. From December 1995, through May 1996, the FBI, in conjunction with CPD-IAD, has conducted four undercover operations in which confidential sources (CS) contacted Chicago Police Officers and set up undercover agents posing as drug dealers to be ripped-off by Chicago Police Officers. CPO Edward Lee Jackson, Jr., CPO Lennon Shields, CPO M.L. Moore, CPO James P. Young, CPO Cornelius Tripp, and Charles Vaughan were all directly involved in committing one or more of these rip-offs of undercover agents. CPO Herbert C. Booker, Jr., was contacted by CPO Jackson during a discussion concerning the proceeds from one of the rip-offs. The details of each of the four undercover rip-offs are set forth below.

## UNDERCOVER RIP-OFF ONE

14. On December 7, 1995, at approximately 12:15 p.m., CS #1, at the direction of the FBI, paged CPO Jackson at pager number

11

(312) 820-3341. Shortly thereafter, CPO Jackson called CS #1 and, in a consensually monitored telephone conversation, CS #1 told CPO Jackson that an out of town drug dealer and his courier girlfriend came to Chicago to purchase drugs.[4] CPO Jackson planned to confront the courier while she met with CS #1 near Bloomingdale and Menard Streets in Chicago. (Unbeknownst to CPO Jackson, the courier was an Undercover Agent (UCA)) During the conversation, CS #1 compared the rip-off plan to a previous rip-off of an individual nicknamed "Bay-June" and CPO Jackson agreed. Gang Crimes Specialist Grapenthien advised that gang members stole about two (2) kilos of cocaine from Frankie Jackson, aka Bay-June in mid October 1995.

15. Later on December 7, 1995, CS #1, under the direction of the FBI, again paged CPO Jackson at pager number (312) 820-3341. Shortly thereafter, CPO Jackson called CS #1 and, in a consensually monitored telephone conversation, they again discussed when CPO Jackson could rip-off the drug courier (UCA). During the conversation, CPO Jackson advised that he would get a crew together and that the rip-off could be done today, tomorrow (December 8) or Saturday (December 9). Pen Register records indicate that on December 7, 1995, at 8:08 p.m., 8:10 p.m., 8:19 p.m., and 8:49 p.m., calls were made from CPO Jackson's cellular telephone number (312) 505-0724, ESN 876C1FB7 to CS #1's residence. These calls

---

[4] According to CS #1, CS #1 was able to set up the rip-offs of the undercover agents by CPO Jackson and other CPOs because CS #1 had, prior to his cooperation with the FBI, set up actual rip-offs of drug dealers by CPO Jackson other CPOs. See paragraph 35.

were consensually monitored and the conversations included some additional planning for the rip-off of the drug courier (UCA).

16. On December 8, 1995, CS #1, advised that he/she and CPO Jackson met for forty-five minutes in a white Mercury Sable and planned how CPO Jackson would rip-off CS #1 and the courier (UCA) later that afternoon. Also present during this meeting was CPO Shields. CS #1 and CPOs Jackson and Shields then met an unidentified woman at a laundromat at Pulaski and Augusta Streets, who provided CPO Jackson with a dark blue or black colored Chevrolet automobile. CPO Jackson instructed CS #1 to meet with the courier (UCA) and to turn his/her hat around as a signal when CS #1 was certain that the courier had the money.

17. On December 8, 1995, an FBI and CPD-IAD surveillance team observed CS #1 and the courier (UCA) as they sat inside the UCA's car parked near Menard on Bloomingdale on Chicago's west side. Surveillance observed CPOs Jackson and Shields in the unmarked dark colored Chevrolet with CPO Jackson behind the wheel. When the Chevrolet was observed on Bloomingdale, CS #1 turned his/her hat around to signal that the UCA had the money. The Chevrolet, bearing Illinois license E33109, was observed to pull up behind the UCA's car. Shields then exited the passenger's side of the Chevrolet and proceeded to pull CS #1 out of the UCA's vehicle. Shields was not in uniform. CPO Jackson, also not in uniform, stayed in the car. Surveillance next observed Charles Vaughan, who according to CS #1 is a known Conservative Vice Lords gang member

13

and CS #1's cousin,[5] pull up in front of the UCA's vehicle in the same white Mercury Sable in which CS #1 and CPO Jackson had previously met. Vaughan, who is not a police officer, approached the UCA's vehicle, pulled the UCA out, and placed the UCA in a prone position on the ground. CPO Shields then stole thirty-two hundred dollars ($3,200) from the UCA. CPOs Jackson and Shields and Vaughan then departed the area. An Illinois Motor Vehicle Division computerized records search revealed that Illinois license plate E33109 was actually issued to a 1990 Cadillac, owner Tawana T. Epruill, 1706 N. Luna, Chicago, Illinois.

18. The UCA advised that during the above described theft, CPO Shields yelled back toward the Chevrolet and addressed CPO Jackson as "Pacman."

19. On December 8, 1995, at approximately 7 p.m., CS #1 travelled to Charles Vaughan's Aunt's home at 3957 W. Thomas, Chicago. On the way, CS #1 saw the dark colored Chevrolet used in the above described theft parked at CPO Jackson's residence, 3117 West Lexington Avenue, Chicago. CS #1 then met with Vaughan at 3957 W. Thomas, Chicago. Vaughan gave CS #1 one hundred dollars; eight ten dollar bills and one twenty dollar bill which Vaughan stated was money taken from the courier (UCA) in the rip-off. Vaughan told CS #1 that CPO Shields gave him nine hundred dollars of the stolen money and kept the rest.

---

[5] CS #1 was aware that Vaughan was a Vice Lord and an associate of CPO Jackson, but did not know of Vaughan's involvement in this rip-off until that day.

20. On December 8, 1995, at approximately 8:40 p.m., CS #1 provided Special Agent R. Lee Walters with the eight ten dollar bills and one twenty dollar bill given to CS #1 by Charles Vaughan. A review of the serial numbers of these bills identified all eight of the ten dollar bills as bills which made up the thirty-two hundred dollars ($3200) stolen from the UCA earlier that day.

### UNDERCOVER RIP-OFF TWO

21. On March 13, 1996, at approximately 8:18 p.m., CS #1, at the direction of the FBI and in the presence of the UCA, paged CPO Jackson at (312) 707-7316 using the UCA's cellular telephone.[6] CPO Jackson returned the page approximately two minutes later. CS #1 advised CPO Jackson that CS #1 was with a big time drug dealer (UCA) who was carrying a large amount of cash, and that they were going to stop at Uncle Remus' Chicken Shack on Madison at Central in Chicago. CPO Jackson instructed CS #1 to page him again when they were at that location. At approximately 8:40 p.m., an FBI and CPD-IAD surveillance observed CS #1 and the UCA arrive at Uncle Remus' Chicken Shack, 5615 W. Madison, Chicago, Illinois. CS #1 again paged CPO Jackson at (312) 707-7316. Approximately two minutes later, CPO Jackson returned the page. CS #1 told CPO Jackson that they were at Uncle Remus' Chicken Shack and gave him a description of the UCA's vehicle. CPO Jackson said that he was on his way. Approximately ten minutes later, CPOs Moore and Shields arrived and approached the UCA's vehicle. CPOs Moore and

---

[6] On January 5, 1996, CS #1 advised that CPO Jackson had recently lost his (CPO Jackson's) digital pager and had obtained a new one, pager number (312) 707-7316.

1   that they had authorization to wire tap his phone as well

2   to listen to certain overhears.

3              MR. HERSH:  Not in this case.

4              MS. HILL McCLAIN:  Well, I'm sure they have those

5   recordings as well.  I don't know if these particular prose-

6   cutors have that but the other prosecutors are here in court

7   listening and keeping watch over this particular proceeding.

8              In any event, this piecemeal waiver has now raised

9   new issues, and my client has just asked me a good question,

10  he said, "What's going on now?  What does all this mean?"

11  and I'm not sure how to advise him at this point until I hear

12  further from the Court what it is that you want us to do at

13  this point.

14             I believe that the Court is now saying that before

15  we can get to step B, which involves the witnesses in this

16  case, we need to resolve step A, which --

17             THE COURT:  I think it's basic.  Don't you?

18             MS. HILL McCLAIN:  I agree.  So I need to now talk

19  to him regarding that issue, because I think it puts things

20  into a different perspective, because if we don't resolve

21  point A we can never get to point B.

22             THE COURT:  Okay.  Well, do you want to talk to

23  him about that?

24             MS. HILL McCLAIN:  Yes.

25             THE COURT:  Okay.  Why don't you do that.  I'll step

Exhibit 7, ___ of ___ 9

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILINOIS
EASTERN DIVISION

**RECEIVED**

SEP 29 1999

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA        )
                    plaintiff   )    Judge Ann C. Williams
      ~ V ~                     )
Edward Lee Jackson Jr           )
                    defendant   )    Case No. 96 Cr 815

Affadavit Of Micheal Hunt

Micheal Hunt being duly sworn on oath deposes and states the following fa

i). that on october 20 & 21 of 1996 he was the owner and driver of a maroo
    1988 chevrolet van which was parked in ffont of 3126 W. arthington plat
    number CTC 545 ILinois, with a vin number of igbdmi5z4jbi29422.

2). that on these dates he never transported nor spoke with anyone located
    3126 w. arthington to either the " clique night club " or to " laflin &
    Taylor streets ", nor did he travel to either of these locations at any

3). that on these dates he was never stopped, pulled over or spoken to by E
    Lee Jackson Jr nor any other law enforcement official, nor has Edward L
    Jackson Jr ever attempted to rob,extort, or bribe him of " anything ".

4). that he has known Edward Lee Jackson Jr for approximately 23 years.

5). that he is gainfully employed and has never been involved with narcotics
    or street gangs .

6). that he does not know individuals name "snow" or "Kerry" .

7). that he has not been offered or promised anything or threatened  to make
    this statement , that the statement  is entirely voluntary.

subscribed and sworn this _13th_ day of January 1999

Subscribed and sworn to Before me
this _13th_ day of _Jan 1999_
at Chicago, County of Cook, State of Illinois.

Notary Public _____

I declare under penalty of per
to the facts contained within
statement .

Micheal Hunt
3129 w

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America )
Plaintiff )
)
)
)
vs. ) Case # 96 CR 815
) Judge Ann C. Williams
)
Edward Lee Jackson, Jr. )
Defendant )

Exhibit 8, ___ of 9

RECEIVED

SEP 3 0 1999

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

## AFFIDAVIT

I Larae Bailey, Swear under Penalty of Perjury, to the True Facts contained within this document:

1. My testimony at the Grand Jury in this case was not true.

2. The Police Officers/agents involved in this matter, threatened to indict me and coerced my testimony and coached me what to lie about.

3. Edward Jackson, Jr. and Cornelius Tripp have never given me any drugs.

4. I have never engaged in any type of criminal activity with Edward Jackson, Jr., Terry Young or Cornelius Tripp. Nor have I assisted in the planning of criminal activity.

5. My relationship with Edward Jackson, Jr., Cornelius Tripp and Terry Young - was purely business, with limited social interaction.

6. When I was engaged in a conversation with Edward Jackson, Jr. on July 4, 1996, I explained to the Government that I understood vitamins to mean, Barbeque & that when I used the word whoppies, I meant Barbeque - but the police officers/agents forced me to lie and interpret the meaning to be a criminal conversation.

7. I am coming forward, telling the truth now, because I don't want any innocent person(s) convicted of any crimes which did not occur, that someone else has lied about. No person has threatened or coerced me, this statement is given entirely voluntarily.

Subscribed and Sworn to this _24_ day of _July_, 1999.

_Larae Bailey_
Larae Bailey

TO Whom it MAy CONCeRN:

I AM NOt PRomise

ANything OR thReat

At All. FOR My SigNAtuRe
FOR the AFFidAvit, DAted
7-24-99

Wittnessel! Ontonette
Young

July 24, 1999!

IN THE UNITED STATES DISTRICT COURT
NORTHERN District of Illinois
EASTERN Division

Exhibit 9, ___ of 9

United States of America )
             plaintiff )  Judge Ann C Williams
   -v- )
Edward Lee Jackson Jr )  Case number 96 CR 815
        defendant )

RECEIVED
MAR 25 1999
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## Affidavit

1. That during his First attorney visit with his prior Attorney Joan Hill McClain he inform Joan Hill McClain to Request an Evidentiary hearing Regarding a Robbery on 12-8-95 That defendant was being framed for.

2. That he inform attorney McClain to Secure a Sworn affidavit from his Co-defendant Charles Vaughn because Charles Vaughn had Related to him that members of the prosecut team had violated title 18 USC 1512 (b)(1) by attempting to have Charles Vaughn lie toward defendant Regarding the 12-8-95 fake Robbery.

3. That he inform attorney McClain that Since it was "Very obvious" that the Govern had used false evidence to Secure an indictment towards defendant to file a motion with the Court moving for dismissal of Said indictment before the government could clean.

4. That he inform his attorney to Secure a Sworn affidavit from Lennon Shields his Co-def because Lennon Shields Related to defendant that he was being pressured to implicate def in a 3-13-96 charge. even though he made the government aware defendant wasn't involv

5. That he inform his attorney to motion to the Court for an evidentiary hearing Regarding the Conduct of prosecutor Brian Netols and FBI Special agent R Lee Walkers at defendant Bond hearing 12-23-96 in which prosecutor Netols intentionally and Knowingly violated defendants due process at Said Bond hearing by introducing false evidence and then directing Walkers to misRepresent his testimony before Magistrate Judge Pallmeyer by lying in Regards to weapons Recovered from defendants Residence, and lying in Regards to intentionally misidentifying defendant in a "gang obituary". in that both were aware that Said weapons were properly Purchased by defendant and that the Person Walkers misidentified as defendant did not Remotely Resemble defendant. These actions Constituted Perjury and Subornation

pg. 2

6. That he inform attorney McClain that since Myron Robinson had lied towards defenda that according to federal law, this was basis to challenge the Goverments consensual Recordings against defendant. Since Myron Robinson had knowingly and intentionally commi a criminal act against defendant who is a citizen of the united states. and that she should file a motion Regarding this issue before the court.

7. That he inform his attorney at the time McClain to file a motion before the court Reg tape Recordings which defendant contends were tampered with.

8. That he Requested his attorney McClain to secure a sworn affidavit from his co-defe Gregory Crittleton Regarding a newspaper article which Crittleton Caused to be filed in the Au voice newspaper to ascertain exactly what the government was attempting to have him lie c

9. That he inform attorney McClain to tender to him copies of any and all discovery material motions filed on his behalf and which the government filed against defendant.

10. That he inform attorney McClain to secure a sworn affidavit from william Heard after Heard had written defendant letters stating that the Prosecutors were directing him to lie towards defendant at a federal grand Jury.

11. That he gave attorney McClain a list of Potential witnesses for the defense to tender to the court months in advance of trial.

12. That he Requested that attorney McClain file a motion with the court months in advance of trial making the court aware of numerous tape Recordings that defendant planned on using to collaborate defendants testimony and to Rebutt specific testimony that the government offered as crimes as well as the accompanying transcripts of said tape Recordings.

13. That before the start of trial he inform attorney McClain not to stipulate to any matter which affects defendant in cases 96 CR 815 and 97 CR 63.

4: That he inform attorney McClain to Subpoena the Chicago police Department to secure Repor which would prove to the government that the Rock N Roll Mcdonald's and maffi Inciden were not true

5. That he inform attorney McClain to secure sworn affidavits from the attorneys of Billy Car

pg:3

16. That he inform attorney McClain to file an interlocutory appeal Regarding the counts or as Related to the 12-8-95 incident, and the tape Recordings defendant sought to admit into evidence for his defense. or to file a proper motion before the court to reconsider it's r

17. That during and after trial he inform attorney McClain of numerous instances of false testimony which was material to "Specific charges" against defendant by witnesses Cornelius Tripp, Anthony Buchanan, Victor Younger, Mark Clennons, I-Rae Willis, Tekaitha Brown, and Michael Green while Requesting that attorney McClain Procure the proper documents to prove that these witnesses each lied about matters affecting "Specific charges" against defendant.

18. That he inform attorney McClain that numerous witnesses in the Capharo's case were Complaining that the government had forced, threatened and coerced them to give false test and/or making false statements as Related to "Specific charges" against defendant.

19. That he inform attorney McClain that Myron Robinson was causing messages to be Communicated to defendant that he wanted to tell the truth about the "bag of money" he left the police station with on 5-2-96 as well as the lies he told about defendant Robbing him and his life being in danger.

20. That he inform attorney McClain of the purported victim of the "Laflin incident" wanting give a Sworn Statement that this incident never occurred.

21. That he had informed attorney McClain to make him aware how the government was interpreting taped conversations She was Captured on with his co-defendant Terry Jury.

22. That after his conviction defendant was given evidence from his co-defendants in case 97 c263 that the chief Judge had issued an order allowing the government to conduct a "Special Interception Plan" against attorney McClain as related to an investigation Regarding the obstruction of Justice in a State double Homicide Case (see 97 c263 file II appeal

23. FOR Reasons known only to her Attorney McClain Failed/Declined to accomplish any of these as from defendant.

Pg. 4

24. That during trial in the Captioned Case he had to Continuously ask attorney McClain to make objections and point out conflicting testimonies of various govern witnesses Culminating in the day he testify when attorney McClain failed to ask him certain Questions, and that at one point during Government witness Michal Green direct examination attorney McClain "blanked out" and was totally ineffective.

25. That he has made new Counsel Jeff Levine aware of his prior Counsels ineffective and conflicts, and that he has given Jeff Levine affidavits related to the claims in affidavit, as well as names, addresses, and phone numbers to contact other witnesses a their information is needed to develop the record that Certain "Specific charges" which the government charged, tried, and convicted him of never occurred and was false.

Subscribed and sworn to this 22nd day of march 1999

I Swear under Penalty of Perjury to each of the facts that I've listed which are Contained within this affidavit.

_Edward Lee Jackson_
Edward Lee Jackson Jr
REG number 07516-424
MCC Chicago
71 W. VanBuren
Chicago, Illinois 60605