IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

FILED
JUL 21 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA, )
)
    Respondent-Plaintiff, )
)
-vs- ) Civil No. 1:07-cv-06409
)   (Crim. No. 96-cr-815)
EDWARD LEE JACKSON, JR., ) Judge Charles P. Korcoras
)
    Petitioner-Defendant. )

### PETITIONER'S MOTION FOR LEAVE TO INVOKE DISCOVERY, AND FOR APPOINTMENT OF COUNSEL TO ASSIST IN UTILIZATION OF DISCOVERY PROCEDURES

The Petitioner herein, Edward Lee Jackson, Jr., pro se, hereby respectfully moves this Honorable Court, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Court, to enter an Order granting Petitioner leave to use discovery procedures, authorized under the federal criminal and civil rules ("Fed.R.Crim.P. and/or Fed.R.Civ.P."), in order to develop material facts in support of his pending motion to vacate, set aside or correct sentence, 28 U.S.C. § 2255; Petitioner also hereby requests the Court to appoint counsel to assist him in making effective use of certian discovery procedures if authorized. In support of the instant motion, Petitioner refers the Court to the points and authorities set forth below.

### Standard of Review

"A judge may, for good cause, authorized a party to conduct

discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law. If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A." Rule 6, Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules"). "Whether a petitioner has established 'good cause' for discovery requires a habeas court to determine the essential elements of the petitioner's substantive claim[s] and evaluate whether 'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is...entitled to relief." Williams v. Schriro, 423 F.Supp.2d. 994, 1003 (D.Ariz. 2006) (quoting Bracy v. Gramley, 520 US 899, 908-09 (1997) and Harris v. Nelson, 394 US 286, 300 (1969)). "The decision to grant discovery is left to the sound discretion of the district court, but a blanket denial is an abuse of discretion if the discovery is 'indispensable to a fair, rounded, development of the material facts.'" United States ex rel. Shores v. Warden, Pontiac Corr. Ctr., 95 C 3932, 1995 WL 341390, at *7 (N.D.Ill. June 18, 1995) (quoting East v. Scott, 55 F3d 996, 1001 (5thCir. 1995).

The Discovery Sought and Reasons Therefore

A.  Petitioner's § 2255 motion includes a claim of entitlement to relief on the ground that the Government failed to disclose

-2-

evidence to the defense, in violation of the rule of Brady v. Maryland, 373 US 83 (1963). In order to demonstrate entitlement to relief on the Brady claims, Petitioner seeks to discover records and information pertaining to his case that are within the custody and control of the United States Attorney's ("USA") office, the Federal Bureau of Investigation ("FBI"), and the Chicago Police Department Internal Affairs Division ("CPD-IAD"), including the 3,000-plus pages of investigation records identified in an FBI Freedom of Information Act ("FOIA") response-letter to Petitioner, dated August 1, 2007 (a copy is appended to the Declaration of Edward L. Jackson, Jr., in Support of Motion to Vacate Convictions And Sentence Under 28 U.S.C. § 2255 ("Petitioner's Declaration"), as Exhibit 3). Petitioner's First Interrogatories and Requests for Production of Documents identify additional information and records, sought by Petitioner through discovery, which he reasonably believes will constitute, or lead to evidence that the Government failed to comply with its disclosure obligations under Brady and that Petitioner was deprived of a fair trial thereby.

With respect to the claimed Brady violations, Petitioner's § 2255 motion and supporting papers specifically state that:

> "...I have been the victim of evidence fabrication, false statements, perjured testimony, and other illegal/improper conduct...directed or undertaken by overzealous, self-serving investigators and prosecutors who could not make a case agains me...by any other means...evidence supporting such a defense [made its way into the record prior to my trial]. For example: [c]onfidential [i]formant...Myron Robinson was indicted an pleaded guilty to making false statements to a federal grand jury regarding my involvement in a December 8, 1995 robbery, [a] predicate for [one of

-3-

the counts of my indictment]."[1]

Petitioner's Declaration at ¶ 8;

> "Unacknowledged, unexplained and [undisclosed by the Government, was] the fact that FBI agents Deborah Jones-Buggs, and Joseph M. Karmik, along with [CPD-IAD] Sergeant Eugene Shephard, made statements [under oath] and otherwise acted to corroborate Robinson's lying story about Petitioner's being involved in the December 8, 1995 robbery...A clear inference of it all is that there was collaboration between Robinson and the law enforcement officers to bring false charges against Petitioner."

Petitioner's Memorandum of Points and Authorities in Reply/Opposition to Government's Response to Defendant's Pro Se Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 at 15 n. 11 ("Petitioner's Memo");

> "I believe that, if given the opportunity to develop the relevant facts utilizing available discovery procedures, I can show that the Government withheld from me evidence that was material and favorable to my defense..."

Petitioner's Declaration at ¶ 9;

> "On September 18, 1997, Petitioner...filed a pretrial motion for disclosure of impeaching and exculpatory information in the possession of the prosecution...The trial court granted the motion. However, the Government's response to the discovery motion did not disclose that the investigation which led to Petitioner's indictment had begun in March 1993. At Petitioner's trial, Government witnesses testified that the investigation which led to Petitioner's indictment began in or around November 1995...the indictment contained no charge of a criminal act committed by Petitioner before the fall of 1995. **[Records showing] that the [FBI] investigated Petitioner for more than two years without developing evidence [of any] significant criminal act...was suppressed**

---

[1] Robinson played a key role in several more "undercover operations" which provided the basis for other counts in the indictment against Petitioner. However Robinson's confession to, and conviction for, falsely implicating Petitioner in the December 8, 1995 incident was kept from the jury by order of the trial court, and with it, the reasonable inference that Robinson acted with disregard for the truth in other contexts material to the determination of Petitioner's guilt or innocence.

-4-

   **by the Government."** (emphasis added)

Petitioner's Memo at 14;

> "...In response to [a] FOIA reqeust...records were [disclosed]...which established that the FBI initiated its investigation of Petitioner in March 1993...The FBI's [8/1/07 FOIA] response...indicates that there exist more than 3,000 pages of..... records  that were not released because [I] was unable to pay copying costs due to indigence...Whatever the content of the 3,000 pages of undisclosed investigation records, their [mere] existance is favorable to the defense and material to the question whether Petitioner was guilty as charged or was the victim of a frame-up because, if disclosed prior to trial, the prosecution could not have mislead the jury in regard to when its investigation began and Petitioner could have argued that[:] frustrated by failure to develop legitimate incrimintating evidence after two years, police/prosecutors resorted to illegal/improper means to make a major case against petitioner...[but] there is reason to believe that the undisclosed records contain [additional] favorable and material information..."

id. at 14-16;

> "...The evidence suppressed by the Government of its long and fruitless investigation of Petitioner, when viewed in context with [evidence that an informant and law officers acted in concert to falsely inculpate Petitioner], can reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdicts and require a new trial."

id. at 17-18. Also, filed with Petitioner's Memo as Exh. 5 is the affidavit of FBI Agent Joseph M. Karmik, which states pertinently--

> "...CPO Jackson called CS #1 and, in a consensually monitored telephone conversation, CS #1 told CPO Jackson that an out of town drug dealer and his courier girlfriend came to Chicago to purchase drugs..(Unbeknownst to CPO Jackson, the courier was an Undercover Agent (UCA))...
>
> "On December 8, 1995, an FBI and CPD-IAD surveillance team observed CS #1 and the courier (UCA) as they sat inside the UCA's car parked near Menard on Bloomingdale on Chicago's

> west side. **Surveillance observed CPOs Jackson and Shields in the unmarked dark colored Chevrolet with CPO Jackson behind the wheel.** When the Chevrolet was observed on Bloomingdale, CS #1 turned his/her hat around to signal that the UCA had the money. The Chevrolet...was observed to pull up behind the UCA's car. Shields then exited the passenger's side of the Chevrolet and proceeded to pull CS #1 out of the UCA's vehicle...CPO Jackson, also not in uniform stayed in the car. Surveillance next observed Charles Vaughan...pull up in front of the UCA's vehicle...Vaughan ...pulled the UCA out, and placed the UCA in a prone position on the ground. CPO Shields then stole thirty-two hundred dollars...from the UCA. **CPO's Jackson and Shields and Vaughan then departed the area...**
>
> "**The UCA advised that during the above described theft, CPO Shields yelled back toward the Chevrolet and addressed CPO Jackson as 'Pacman.'**"

Karmik Affidavit at ¶¶ 14, 17, 18 (emphasis added). The "CS #1" referred to in the Karmik Affidavit is Myron Robinson who, in pleading guilty to making false statements to a grand jury, admitted neither Jackson nor Shield was even in the vicinity of the alleged December 8, 1995 robbery, and that he (Robinson) had previously testified falsely with respect thereto. The Karmik Affidavit is, therefore, evidence that investigators knowingly corroborated the false statements that resulted in Robinson's conviction; and it lends support to Petitioner's claims that the prosecution suppressed evidence of illegal/improper Government conduct on a wider scale. In the absence of some opportunity for discovery on this issue, it is impossible to say with confidence that other law enforcement officers involved in the investigation and prosecution of Petitioner were not party to a by-any-means-necessary approach to securing convictions, under which false statements and testimony

was the rule rather than the exception.[2/] What's more, the trial judge, perhaps unwittingly, aided and abetted prosecutors in suppressing evidence of improprieties in building the case against Petitioner by the entry of various pre-trial orders preventing the defense from calling Myron Robinson as a witness, from making mention of the December 8, 1995 incident in the presence of the jury, from presenting any evidence of entrapment, among other things. In any event, Petitioner is not at fault for the failure to previously develop facts regarding claim that his convictions are the product of unlawful/improper Government conduct.

If Petitioner can prove that the Government suppressed or failed to disclose evidence in violation of its obligations under Brady, he is entitled to relief on his motion under 28 U.S.C. § 2255. Based on the foregoing "specific allegations" of Petitioner, and the evidence presented which "lends some support" to such allegations, there is good cause for the Court to grant Petitioner leave to conduct discovery on his claims that the Government suppressed material evidence favorable to the defense.

---

[2/] In addition to granting Petitioner leave to serve interrogatories and requests for admissions/production-of-documents, Petitioner requests authorization, pursuant to Fed.R.Cv.P. 30, to depose Myron Robinson, FBI Agents Karnik and Deborah Jones-Buggs (believed to be the "UCA" who was allegedly robbed during the December 8, 1995 incident), as well as CPD-IAD officer Eugene Shepard and other law enforcement officers who may be identified through the aforementioned discovery procedures. The deposition testimony of these particular persons is sought in order to develop the facts surrounding the December 8, 1995 incident. Petitioner expects this deposition testimony to show that informant Myron Robinson acted in concert with his police/FBI handlers to falsely incriminate and entrap Petitioner. Appointment of counsel is also requested to assist Petitioner in making effective use of the discovery procedure under Rule 30.
Petitioner also seeks to depose Charles Vaughn regarding attempts by Government agents to coerce him to give statements/testimony falsely incriminating Petitioner, an in regard to other matters set forth in Vaughn's Affidavit, annexed to Petitioner's Memo as Exhibit 2.

Bracy, supra, 520 US 909; see also, United States ex rel. Maxwell v. Gilmore, 37 FSupp2d 1078, 1095 (N.D.Ill.1999) (granting habeas petitioner leave to conduct discovery on claim that prosecutors withheld exculpatory information about police officers widespread abuse of prisoners in extracting confessions, where the Petitioner presented evidence that during time he was in custody on charges which resulted in his conviction, he was interrogated by officers who had since been implicated in such abuse); Moore v. Gibson, 195 F3d 1152, 1164-66 (10thCir.1999) (reversing district court's denial of discovery on habeas petitioner's claim that police officers planted incriminating evidence used to convict him and did not disclose this fact, in violation of Brady rule).

B.   Petitioner's § 2255 motion includes a claim for relief on the ground that he was denied his constitutional right to conflict-free counsel and the effective assistance of counsel for his defense.  In order to demonstrate that he is entitled to relief on the aforesaid conflict and ineffective assistance claims, Petitioner seeks to discover documents and information pertaining to an alleged investigation of attorney Joan Hill McLain, by federal and/or state authortiies, while Ms. McLain was Petitioner's counsel of record in case no. 96-cr-815.  Petitioner also seeks to discover documents and information, identified in the Interrogatories and Request for Production filed herewith, which will show:   Government attorneys knew that Ms. Hill McLain was

a target of investigations but failed to disclose that fact to the Court, Petitioner or Counsel in the context of conflict of interest waiver/disqualification hearings; that trial counsel was ineffective in failing to investigate/discover Government complicity in Myron Robinson's efforts to falsely incriminate Petitioner, and in failing to object to Government motions to preclude the defense from calling Robinson as a witness, mentioning the December 8, 1995 incident in the jury's presence, and from presenting evidence to support entrapment defense;[3/] that counsel was constitutionally ineffective in failing to file a motion for judgment of acquittal as to certain Hobbs Act convictions on ground the prosecution failed to establish that all cocaine originates overseas; that trial counsel was constitutionally ineffective in other respects.

In support of his conflict-of-interest/ineffective-assistance claims, Petitioner's § 2255 motion and supporting papers specifically state that:

> "During a hearing before [J]udge Lindberg on December 29, 1997, the Government revealed that conversations between Ms. Hill-McClain and Terry Young had been recorded on an authorized wiretap, implicating...a potential conflict of interest in Ms. Hill-McClain's representation of me...
> "[This] conflict of interest issue was...addressed in a hearing before Judge lindberg on January 12, 1998. In addition to the interception of Ms. Hill-McClain a dozen

---

[3/] Petitioner feels compelled to note to the Court, once again, that his ability to identify viable claims for collateral relief and to present specific in support thereof, or reference specific matters relevant thereto, is prohibited by lack of access to the records of his case. In the context of the instant motion, lack of access to the record prevents Petitioner from making specific reference to pretrial motion and orders pertinent to the issues, among other things.

      times during course of wiretap on Terry Young's telephone, it was brought out that documents appearing to link Hill-McClain and Mr. Young in business affairs were seized during execution of a search warrant at Mr. Young's home, and that other individuals who Ms. Hill-McClain had previously represented would be called as witnesses for the Government and that Ms. Hill McClain herself might be called as a witness in 97-cr-63. **Government counsel represented that there was a need for Mr. Young and I to reconsider our previous conflict waivers in light of the new information.**"

Petitioner's Declaration at ¶¶ 17,18 (emphasis added);

      "Also in the afternoon of January 12, 1998, I appeared before Judge Ann C. Williams in case 96-cr-815. Ms. Hill-McClain addressed Judge Williams regarding some of the conflict of interest issues that had arisen in the case before Judge Lindberg.
      "Judge Williams inquired then if Ms. Hill-McClain's representation of me presented conflict issues in case 96-cr-815. In reply, [AUSA] Brian Netols stated that Anthony Buchanan, a witness in 97-cr-63 who had a previous attorney-client relationship with Hill-McClain, would also be testifying for the Government in 96-cr-815.
      "Judge Williams, [Mr.] Netols and Hill McClain all acknowledged that a potential conflict of interest existed if Mr. Buchanan was going to testify for the Government [in] 96-cr-815..."

id. at ¶¶ 19, 20, 21;

      "Ms. Hill-McClain did not fully explain to me the nature and implications of the recorded conversations between her and Terry Young. I did not understand that that the conversations recorded might ocnstitute evidence of Hill-McClain's invlvement in obstructing justice in a double murder prosecuiton. I did not [learn], **until long after I was convicted, that the U.S. Attorney [who] was prosecuting me was also investigating Hill-McClain for possible violations of the criminal laws**; or understand how, in the circumstances, attorney Hill-McClain's representation of me could involve conflicting interests. Ms. Hill-McClain told me only that the recorded conversations concerned other matters/cases, and that if I waived any conflict issues in Judge Lindberg's court I would be severed out of the trial with Terry Young but she would continue to represent me in the case before Judge Williams."

id. at ¶ 24;

"Prosecutors in case 96-cr-815 knew or should have known that Ms. Hill-McClain was under investigation for possible obstruction of justice prior to my trial [but withheld that knowledge from the Court and myself]."

id. at ¶ 29;[4/]

"The existence of potential conflict of interest issues... was acknowledged on the record by Judge Williams...but **Judge Williams did not conduct an inquiry into the possibility of a conflict [of] interest...**
"Attorney Hill-McClain labored under actual conflicts.... while representing me in case 96-cr-815, and her performance was adversely affected as a result...
"Among other things, Ms. Hill-McClain's conflicts of interest caused her to fail to make a timely motion for a judgment of acquittal on the ground that the Government did not offer any proof of an effect on interstate commerce..."

id. at ¶ 30, 31, 32.  See also, Petitioner's Memo at 23-27 (allegations and argument pertaining to conflict/hearing/waiver issues), and Petitioner's Declaration at ¶¶ 33-35 (additional allegations in support of claim that trial counsel failed to provide effective assistance).

---

[4/] Filed herewith, as Petitioner's Exhibit 16, are 5 pages from a document filed by the Government in case 97-cr-63. These papers indicate that: (1) conversations between attorney Joan Hill-McClain and Terry Young were intercepted in September 1996; (2) other conversations intercepted on the target telephone, around the same time, "reflected an apparent attempt [by recorded parties] to intimidate state witnesses in a murder prosecution" that conversations between Hill-McClain and Terry Young could be connected to; (3) the Government intended to intercept future Hill-McClain conversations in order to determine whether she "is a knowing participant...or aider and abettor in the...commission of...offenses, including the apparent attempt to obstruct justice in the state murder prosecution"; (4) the Government intended "to seek authorization to serve Hill-McClain with an inventory as provided in 18 U.S.C. § 2518(8)(d)." Petitioner's Exhibit 16, pg. 1 of 5.
    Exhibit 16 provides evidentiary support for the allegation, quoted above, regarding the Government's knowledte of, and failure to disclose, potential conflict of interest issue. It also appears to controvert the Government's representations, during a hearing in the case on April 28, 1998, regarding whether or not Hill-McClain had been the subject of investigation by federal authorities.

If Petitioner can prove that "the trial judge knew or should have known that a potential conflict of interest existed and did not adequately address the issue with [him, or]that...counsel actively represented conflicting interests and that the conflict adversely affected...counsels performance", he is entitled to relief on his conflict-of-interest/ineffective-assistance claim. United States v. Wallace, 276 F3d 360, 366-67 (7thCir.2002) (citing Strickland v. Washington, 466 US 667, 687 (1984) and Cuyler v. Sullivan, 446 US 335, 350 (1980)). Petitioner expects the discovery he seeks to show that: (1) Joan Hill-Mclain was under investigation for possible obstruction of justice during the time she was Edward Lee Jackson, Jr.'s attorney in case no. 96-cr-815, creating an actual conflict of interest; (2) the Government knowingly and deliberately withheld the fact of the Hill-McClain investigation/conflict from the court presiding over 96-cr-815 and from Edward Lee Jackson, Jr.; (3) that Hill-McClain knew she was being investigated for possible obstruction of justice but failed to disclose that fact to Petitioner Jackson; (4) Ms. Hill-McClains performance as Petitioner's trial attorney was adversely affected by her actual conflicts of interest; (5) Ms. Hill-McClain rendered ineffective assistance to Petitioner independent of her actual conflicts of interest.

Based on the above-cited "specific allegations" of Petitioner, and the evidence presented which "lends some support" to those

allegations, there is good cause for the Court to grant Petitioner leave to conduct discovery on his conflict-of-interest/ineffective-assistance claims, utilizing interrogatories, requests for production/admissions, and depositions.[5/] Bracy v. Gramley, supra, 520 US at 909.

## Conclusion

Petitioner respectfully requests this Court to afford the instant motion the liberal construction which it is entitled and, based on the points and authorities set forth above and the entire record of the case: (1) grant Petitioner leave to use discovery procedures to more fully develop facts supporting his claims for collateral relief; (2) appoint counsel to assist Petitioner in making effective use of discovery procedures; (3) grant such other and further relief to Petitioner as the Court may deem fair and just.

---

[5/] In connection with his conflict-or-interest/ineffective-assistance claims, Petitioner seeks to depose attorney Joan Hill-McClain, Charles Vaughn, AUSA Brian Netols, and others able to provide relevant information. Petitioner intends to supplement the instant motion with a more detailed description of the subject matter to be explored in the requested depositions by oral examination.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that all statements in the foregoing motion are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

July, 14, 2008

*Edward Lee Jackson Jr.*
Edward Lee Jackson, Jr.
Reg. No. 07546-424
Federal Correctional Institution
P.O. Box 1000
Cumberland, MD 21501-1000

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2008, I sserved a true and correct copy of the foregoing motion on the attorneys for the Respondent, by delivering same to prison authorities for mailing, with first class postage prepaid and addressed to:

Brian Netols
Assistant U.S. Attorney
219 Dearborn Street
Chicago, IL 60604

*Edward Lee Jackson Jr.*
Edward Lee Jackson, Jr.

ATTACHMENT A

aka "POO BEAR", aka "ERIC PRINCE"; BILLY CARTER; ANTHONY BUCHANAN, aka "RED"; ELDRIDGE IVY; CORNELIUS JACKSON, aka "LI'L RIDE"; KENNETH CHOICE, aka "PEP"; CURLEY HARVEY; JOHNNY DORTCH; MOHAMMAD MANSOORI, aka "MOE"; MARVIN HUDSON; a person known only as "SILK"; a person known only as "ALAN"; a person known only as "NAT"; a person known only as "MICHAEL"; a person known only as "RANDY"; and others who are unknown or who have not been identified by name, occurring to and from the telephone bearing the number (312) 330-8743, a cellular telephone on the system operated by the service provider Cellular One marketed to consumers through Nova Cellular, subscribed to under the name MARY EASON, billed to 141 North Wolcott, Chicago, Illinois, Electronic Serial Number 15607328268.[1] These telephonic communications are expected to concern offenses which are specified in Title 18, United States Code, Section 2516, that is offenses involving the illegal possession with intent distribute and the illegal distribution of heroin and cocaine,

---

[1] As outlined in a "Special Notification Regarding Developments In Investigation" filed by the government with Chief Judge Marvin E. Aspen on October 2, 1996, and also discussed below in Paragraphs 71-74 of this affidavit as well as in Footnote 8 of this affidavit, conversations intercepted on the target telephone 330-8743 have reflected an apparent attempt to intimidate state witnesses in a murder prosecution. In connection with this apparent effort, the government intends to intercept conversations of attorney JOAN HILL McCLAIN on the target telephone under a minimization plan specified in Footnote 8 of this affidavit. Based on the facts set forth in this affidavit, it is not clear that attorney JOAN HILL McCLAIN is a knowing participant or knowing aider and abettor in the named violators' commission of any ongoing offenses, including the apparent attempt to obstruct justice in the state murder prosecution, and therefore she is not named in the text above as a "named interceptee." It is the government's intention to seek authorization to serve JOAN HILL McCLAIN with an inventory as provided in 18 U.S.C. § 2518(8)(d).

2

Exhibit 16, pg. 1 of 5

### Conversations With Attorney Joan Hill McClain

71. As noted in a notice filed with Chief Judge Marvin E. Aspen during the course of the first 30-day interception, "Special Notification Regarding Developments in Investigation," during the course of interception the following events occurred or were discovered:

(a) On Sunday, September 29, 1996, at approximately 7:52 p.m., TERRY YOUNG spoke on the target telephone with a man named "MICHAEL." After discussing another matter that appeared, in the context of this and other intercepted telephone conversations in this investigation, to involve narcotics, MICHAEL told YOUNG, "Dude just beeped me, SHAMON, right? He said something about--told me to get up with you, to get up with Dude, the witness." YOUNG told MICHAEL, "Yeah, I know, I'm on them already--ah, DONNIE and RONNIE." MICHAEL told YOUNG, "He said they came to court the other day." YOUNG told MICHAEL, "Yeah. We gonna stop them. They ain't going to come to court next time. They got to go see that lawyer." MICHAEL asked YOUNG, "Go see lawyer?" YOUNG responded, "Yeah." MICHAEL asked what he should tell "him," apparently referring to SHAMON, when SHAMON called MICHAEL. YOUNG responded, "Tell him to quit running his mouth so much, that's all. Tell him to shut the fuck up. Tell him I'm fixin' to try to work on that now (UI) them little niggers acting like some little bitches, but you know I'm trying to start on it now, starting to get somebody who called over them," apparently referring to someone who has control over "DONNIE" and "RONNIE."

34

(b) On Monday, September 30, 1996, at approximately 8:12 a.m., TERRY YOUNG placed a call on the target telephone to JOAN HILL McCLAIN, a Chicago attorney. During this brief conversation, YOUNG and McCLAIN appeared to discuss the scheduling of a legal matter involving YOUNG, namely court dates for YOUNG on October 30th and November 20th. They did not discuss the content of the apparent legal matter, and no legal advice or strategy was referred to. McCLAIN asked YOUNG for "referrals." YOUNG asked McCLAIN when "Shamon's case" would be "up." McCLAIN responded that she would have to check her calendar, but it would be either Tuesday, October 1st or Wednesday, October 2nd. YOUNG responded, "I'm fixin' to go to work now, okay?"

(c) Also on Monday, September 30, 1996, at approximately 12:22 p.m., TERRY YOUNG placed a call on the target phone to an unknown male ("U/M"). YOUNG told the U/M that "RONNIE" and "DONNIE" were "coming to court on them brothers, on that case, on that murder case, is up for tomorrow. They came to court last night." The U/M responded, "(UI) Rockwell?" YOUNG said, "Yeah." YOUNG said, "They come to court, man, they, they, they _really_ come to court." The U/M responded, "Okay, let me get on the horn right quick now." YOUNG said, "I think they go to court tomorrow. They need to go to see JOAN today, man, so they can straighten that shit out, man." The U/M repeated that he would "get on the horn."

(d) Public records of the Circuit Court of Cook County reveal that a SHAMON MILLER is charged in case 94 CR 1909801 with: two counts of murder and three counts of attempted murder; three

counts of aggravated battery; and two counts of discharge of a weapon into an occupied space. The records reveal a status date was to be held before the Hon. Ralph Reyna for Thursday, October 3, 1996 at 9:30 a.m.

(e)  CPD Gang Crimes Specialist ("GCS") MICHAEL CRONIN, who is participating in the instant wire interception investigation, has interviewed Assistant States Attorney MICHAEL SMITH regarding the SHAMON MILLER murder case. SMITH told CRONIN that two potential witnesses for the State in that case include persons named "RONNIE" and "DONNIE." SMITH told CRONIN that MILLER is being represented in that case by JOAN HILL McCLAIN.

72. Based on facts recited above, Affiant believes that: Terry Young and others are attempting to prevent two witnesses from testifying on behalf of the State in the Shamon Miller murder trial; that they are using attorney JOAN HILL McCLAIN in some manner to prevent the testimony of the witnesses ("We gonna stop them"); and that Terry Young is using the target telephone to communicate with others about this attempt.

73. More specifically, Affiant believes that Terry Young may discuss this attempt to prevent witnesses from giving relevant evidence at the murder trial during the course of telephone conversations with Joan Hill McClain on the target telephone during the course of the instant wire interception investigation.

74. Based on the above, Affiant also believes that in speaking on the target telephone during the course of the instant wire interception investigation, JOAN HILL McCLAIN and TERRY YOUNG

36

may engage in conversations related to McCLAIN's apparent representation of Young in some legal matter, and that they may have such conversations during the course of longer conversations involving the attempt to prevent two witnesses from testifying at the murder trial.

PRESENTLY IDENTIFIED SUBJECTS/INTERCEPTEES

75. Affiant has reviewed the Chicago Police Department (CPD) and FBI arrest history records for those individuals whose intercepted telephonic communications concern offenses specified in Title 18, United States Code, Section 2516, for which there was adequate personal history information to attempt to make accurate identification. The arrest histories of several interceptees were detailed in the original affidavit, filed on September 16, 1996, and attached hereto in **Group Exhibit E.** Those individuals whose arrest histories are contained in **Group Exhibit E** include, TERRY YOUNG, aka "T-FLY"; EDWARD LEE JACKSON, Jr., aka "PACMAN"; MARK COX, aka "POO BEAR", aka "ERIC PRINCE"; BILLY CARTER; ANTHONY BUCHANAN, aka "RED"; and ELDRIDGE IVY. The arrest histories of newly identified interceptees for which there was adequate personal history information to insure their accurate identification are as follows:

76. <u>CORNELIUS JACKSON:</u> JACKSON has been arrested by the CPD on nine occasions between January 10, 1989, and February 28, 1996, on allegations of violations that include battery, armed robbery, possession of a stolen motor vehicle, disorderly conduct, possession/delivery of a controlled substance, and phone fraud.